**BEERMART, INC., Plaintiff,**

v.

**The STROH BREWERY COMPANY, Defendant.**

No. L 85–150.

United States District Court, N.D. Indiana, Hammond Division, at Lafayette.

April 18, 1986.

Richard M. Davis, Gordon Etzler, Valparaiso, Ind., for plaintiff.

Stephen R. Pennell, Lafayette, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This case is a civil action seeking damages in excess of $10,000.00, and injunctive relief for alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1, Indiana Monopoly Act, I.C. § 24–1–2–1, Indiana Alcoholic Beverage Laws, I.C. 7.1–5–5–9, and for breach of contract and is presently before this court on plaintiff's BeerMart, Inc. (BeerMart), Motion for Preliminary Injunction. This motion is based only on the violations of state law. The parties presented testimony and oral argument before the court on March 6, 1986 and have submitted briefs on the motion. The court now finds the facts and states its conclusions of law thereon in accordance with Rules 52 and 65 of the Federal Rules of Civil Procedure.

### I.

BeerMart is an Indiana corporation with its principal place of business in Rensselaer, Indiana. BeerMart is a large beer wholesaler that has operated as wholesale distributor of alcoholic beverages in the northwestern area of the State of Indiana since 1949 under the authority and permission of the State of Indiana's Alcoholic Beverage Commission. Until three or four years ago, BeerMart was known as Jasper County Distributors, Inc. BeerMart distributes the products of all the major breweries, including The Stroh Brewery Company (Stroh), Anheuser-Busch, Inc., Miller Brewing Company, G. Heileman Brewing Company, Pabst Brewing Co. and Falstaff Brewing Company. In 1985, BeerMart had sales of approximately ten million dollars having sold over 1.3 million cases of beer and 19,878 half barrels of beer. To break even, BeerMart must sell about one million cases of beer per year. BeerMart's assets are in excess of one million dollars and there are no mortgages against the property. BeerMart has a line of credit that it may draw on, which it does in peak season. BeerMart has approximately 25 employees.

Ralph Smith is the President, Chief Executive Officer and General Manager of BeerMart. He and his wife, Donna Smith, owned 135 of the 136 outstanding shares of stock in BeerMart at the time of the activities that gave rise to this lawsuit. Ralph Smith's brother, John Smith, owned the other outstanding share but that is now being purchased by Ralph and Donna Smith. Ralph and Donna Smith are the officers and directors of BeerMart. Ralph Smith has been associated with BeerMart and its predecessor, Jasper County Distributors, Inc. since 1955. Ralph has been the President of the company since 1969 and handles the administrative side of the company. John Smith was the successor manager of BeerMart, second in command and was responsible for the day to day operations of the business and for management of the BeerMart warehouse.

Defendant Stroh is a corporation incorporated under the laws of the State of Arizona with its principal place of business in Detroit, Michigan. Stroh is the brewer of various brands of malt beverages including Stroh's, Stroh Light, Schlitz, Goebel, Schaeffer, Old Milwaukee, Signature and White Mountain Cooler. Stroh's has been doing business with BeerMart and its predecessor Jasper County Distributors, Inc. since 1952.

Prior to the events giving rise to this lawsuit, BeerMart was in good standing with Stroh, was regarded by Stroh as having an efficient successful, trustworthy wholesale operation and Ralph Smith was a man of the highest integrity in the opinion

of the Stroh District Manager for Beer-Mart. BeerMart had never received any formal complaints from Stroh that it was not performing satisfactorily as a Stroh distributor until November 1985. Beer-Mart has never received a formal complaint from any of the other breweries whose products it distributes. Prior to October 1985, BeerMart had never intentionally sold beer that was not eligible for sale, i.e., was overage according to brewery standards.

Over the years, the relationship between Stroh and BeerMart has been governed by written contract. The latest contract was entered into on January 1, 1984 when Stroh and BeerMart entered into a Wholesaler Agreement (Agreement) governing all relations and dealings between the parties and setting forth their respective rights and obligations. The Agreement designates BeerMart as a wholesale distributor of certain Stroh products within BeerMart's area of primary responsibility. Under section 17 and Exhibit 1 of the Agreement, Beer-Mart was authorized to sell the following Stroh products: Schlitz Beer, Schlitz Light Beer, Old Milwaukee Beer, Old Milwaukee Light Beer, Schlitz Malt Liquor, Erlanger Beer, Stroh's Bohemian Beer, Stroh's Beer, Stroh Light Beer, Silver Thunder Malt Liquor and White Mountain Cooler. White Mountain Cooler was added by amendment to the Agreement on April 17, 1985. Beer-Mart is not authorized to be a distributor for Goebel Beer or Schaeffer Beer, two other Stroh beer products. The areas of primary responsibility vary from brand to brand, but basically include the Indiana counties of Benton, White, Jasper, and Newton. The Agreement does not, however, restrict the geographical area within which BeerMart may sell Stroh products nor does it restrict BeerMart's right to distribute products manufactured by other brewers.

Section 3 of the Agreement provides that it is a personal service agreement and Stroh looks to the individuals who are going to be involved in the wholesaler operation in evaluating and determining whether to enter into a wholesaler agreement or approve a transfer of either assets or stock

by an existing wholesaler to a new operation. Individual characteristics such as personal integrity, management ability, financial stability and ability to control and influence the wholesaler operation are important considerations in determining whether to enter in a wholesale agreement from Stroh's standpoint. Ralph Smith was the individual involved with respect to BeerMart.

Section 11 of the Agreement provides for the immediate termination of the Agreement upon occurrence of certain events. Section 11 of the Agreement provides in pertinent part as follows:

(A) *Events Giving Rise to Right of Immediate Termination.* Stroh shall have the right to immediately terminate this Agreement upon the occurrence of any of the following events:

\* \* \* \* \* \*

(iv) The sale by Wholesaler of any Stroh Brand known by Wholesaler to be ineligible for sale pursuant to then existing Stroh Wholesaler Policies relating to overage, damaged, or defective product or packaging.

\* \* \* \* \* \*

(viii) The discovery by Stroh of any fraudulent conduct by Wholesaler in dealings with Stroh or any products manufactured and sold by Stroh.

\* \* \* \* \* \*

In addition to the foregoing provisions, the Agreement also provides in pertinent part at § 23B as follows:

(B) The laws, rules and regulations of the jurisdiction in which Wholesaler conducts its business are hereby incorporated in this Agreement; provided that such incorporation is only to the extent required by law and shall in no event be deemed to include any law, rule or regulation which is invalid or otherwise unenforceable. Any provision of this Agreement which conflicts with a law, rule or regulation required by the preceding sentence to be incorporated herein shall be

deemed superseded by such law, rule or regulation. . . .

There are several Indiana statutes and rules which are incorporated into the terms of the Agreement, including I.C. § 7.1–5–5–9. That statute provides in pertinent part that:

It is unlawful for a beer wholesaler or a brewer

in this state, or a brewer or other person located outside this state who sells beer to a permittee in this state for the purpose of importation and resale within this state to:

 \* \* \* \* \* \*

(2) Cancel or terminate an agreement or contract between a beer wholesaler and a brewer for the sale of beer, unfairly and without due regard for the equities of the other party.

Beer is a perishable product and each of the breweries have established policies with respect to time limitations on the marketing of their products. Stroh's overage beer policy is that packaged Stroh products are not to be sold by retailers more than 90 days after the brewing date if the wholesaler did not maintain the product in a temperature controlled warehouse. If the product is kept in a temperature controlled warehouse, the product must be sold by retailer not more that 105 days after the brewing date. The time limitations for Stroh products in kegs is 45 days. BeerMart's inventory of Stroh products was stored in a temperature controlled warehouse. The purpose of the prohibition on the sale of overage product is to maintain the quality and integrity of the products and the sale of overage beer can injure the reputation and good will of the brewer. It is a generally recognized industry standard at the brewer, wholesaler and retailer levels that overage product should not be sold. When a wholesaler sells to a retailer, the wholesaler must police the product sold. If the beer is not sold by the retailer to the consumer within the time guidelines set by the brewery, the wholesaler must take the beer off the market and dispose of it. Thus, the wholesaler sustains the loss with respect to overage beer. The wholesaler must destroy the overage beer and may go through a process whereby it can obtain a credit on taxes if the proper procedure is followed.

Part of the responsibility of the District Managers of Stroh is to do an inventory at the various Stroh wholesalers' warehouses within their assigned district in order to make sure that the product is fresh and to prevent old beer from getting into the retail market. These inventory checks are done on a regular basis, about every one to two months. If a wholesaler consistently has overage beer in its inventory or does not keep track of the overage beer in its inventory, Stroh would be concerned because it increases the likelihood of that beer getting into the retail market. Stroh would also be concerned if a wholesaler violated another brewer's standards with respect to overage beer. In addition to the inventory checks by District Managers, Stroh's Quality Assurance Department randomly checks retailers for overage beer.

Mr. Sherrell, the District Manager for the district that includes BeerMart, has never found overaged beer in BeerMart's inventory and did not know of any sales by BeerMart of overage beer until the October 1985 incident. Mr. Sherrell has found overage beer in the inventory at Brumm Distributing Company, (Brumm) and has discovered overage product of Brumm on the retailer's shelves. Mr. Sherrell has also had problems with AALCO in Fort Wayne, Indiana and others with respect to the sale of overage beer. Lafayette Beverage Distributors (Lafayette Beverage) has sold overage Stroh Light beer to the Osco store in Tippecanoe Mall in Lafayette, Indiana. Hernik Gahn, the District Manager for central Indiana, has also encountered overage beer problems with some wholesalers including the Beer Company of Hartford City and Juerling Beverage of Richmond.

Stroh terminated one wholesaler in Iowa by the name of Balbort in December 1985 for knowingly selling overage beer but the circumstances surrounding that case were not disclosed in the evidence in this case.

Other investigations of allegations of intentionally selling overage beer have been conducted by Stroh but it has found that there was no substance or basis for the allegation. Stroh has had deficiency proceedings against many of its wholesalers for failure to live up to the performance standards outlined in the wholesaler agreement including the failure to maintain consistently fresh beer in the marketplace or allowing too much beer to go beyond the code date. There have not been any deficiency proceedings against any Indiana wholesaler in the last three years.

In 1980, an incident involving the knowing sale of overage product by an Indiana wholesaler, Juerling Beverage in Richmond, Indiana was handled as follows. A retailer in the Juerling Beverage market had a large amount of overage beer on the premises. Pursuant to the usual procedures, Juerling Beverage was contacted by Stroh and told to pick up the overage beer. Juerling Beverage did so and destroyed a good portion of the overage product. However, contrary to the instruction of Stroh, Juerling Beverage resold a portion of that overage beer to another account. After discovering this sale, Stroh brought Vincent Juerling, the principal owner of the distributorship to Detroit for an explanation and to set up corrective measures to insure that the sale of overage product would not reoccur. Stroh used the opportunity of the meeting in Detroit to set forth other deficiencies in sales and marketing on the part of Juerling Beverage and to set up corrective measures for those deficiencies as well. When Mr. Vincent Juerling came to Detroit for the meeting he was not prepared to answer all of Stroh's concerns about the various deficiencies in sales and marketing. Mr. Juerling returned to his business and prepared a letter which he sent to Stroh outlining his proposal to correct the deficiencies. Mr. Vincent Juerling was not aware that his nephew, Larry Juerling, had sold the overage beer. Corrective measures were set up and Stroh checked to see that no more overage beer was sold by Juerling Beverage and that the sales and marketing deficiencies were being corrected. Larry Juerling is still running the operation for Juerling Beverage and Stroh has not had any problem with Juerling Beverage since that incident.

In Indiana, a beer wholesaler may sell anywhere in the state under Indiana Alcoholic Beverage Commission Rule 28. Although a distributor may be assigned areas of primary responsibility by a brewery, the distributor is not limited to that area and may sell outside their area of primary responsibility. This is referred to as "transshipping." Wholesalers complain about sales by other wholesalers in their area of primary responsibility but transshipping is legal and widespread in Indiana. Brewers don't like transshipping either but they cannot do anything about it with respect to the wholesalers although they have a lobby that works to get legislation passed that would permit exclusive territories. Transshipping usually results in lower prices to the retailer because the transshipper is not performing various promotional services and quality maintenance services that the wholesaler assigned to the territory is performing although there is no direct financial impact on the brewer. Transshipping does, however, affect the brewers' ability to assign responsibility for individual markets and its ability to assure fresh product in the retail market. When wholesalers transship into another market it becomes difficult sometimes to determine which wholesaler may be responsible for overage beer found at a retailer.

Under the Stroh Wholesaler Agreement, Stroh assigns a wholesaler certain brands and the assignment is open-ended, i.e., no termination date is specified with respect to distributing the particular brand or brands. Assignments are not conditioned on any other aspect of a wholesaler's business. Assignments of new brands to a wholesaler are based on recommendations by Stroh field people, including State and District Managers, whose recommendations work their way up through the chain of command at Stroh. Mr. Tippery, Group Vice President of Sales for Stroh makes the final decision on assignments. He reviews

the recommendations depending on the circumstances of the brand, how critical the brand is to Stroh, the sensitivity of the assignment in certain markets and sometimes the size of the market. The Goebel brand of beer was assigned many years ago. Within the last several years, Schaeffer brand of beer was assigned in Indiana. Stroh does not produce a lot of its Schaeffer and Goebel brands of beer unlike Stroh's and Old Milwaukee which are mass produced. Sales of Goebel and Schaeffer are primarily in big, metropolitan areas such as Gary, Hammond, South Bend and Fort Wayne. Although BeerMart wants the right to sell Goebel and Schaeffer beer as a distributor for Stroh, it is not authorized to do so because it is not in a high volume area. Goebel and Schaeffer are lower priced beers. Brumm is authorized to sell the Goebel and Schaeffer brands of Stroh products and Lafayette Beverage is authorized to sell Goebel. When Ralph Smith of BeerMart complained to its District Manage about Brumm selling those brands in its primary area, Mr. Sherrell informed Brumm of the complaint and Brumm ceased selling those brands in BeerMart's area.

Stroh sells its products to all of its Indiana wholesalers at the same F.O.B. price. The wholesalers in Indiana, as independent businessmen, determine their own resale prices and are free to sell Stroh products at any price they choose.

BeerMart is a transshipper and has been one since the fall of 1978 and therefore sells its Stroh products outside of its designated areas of primary responsibility. Stroh has never told BeerMart that it may not sell outside its primary area. Transshipping constitutes about two-thirds of BeerMart's business and the percentage of sales per brand for transshipping is approximately the same as its overall percentage sales per brand. BeerMart tries to limit its sales to within sixty miles of its warehouse for purposes of control. BeerMart is a full service house in that it sells products from all the major breweries. BeerMart built its business on being a complete supplier in that it can provide its customers with a product mix of multiple brands. BeerMart "pre-sells" a large percentage of its total sales to a relatively small number of high volume customers. "Pre-selling" means that BeerMart receives a purchase order from its customers well in advance of the time BeerMart orders and receives delivery of that product from the brewery. BeerMart writes its purchase orders with its major accounts on a weekly basis for delivery about two months later, i.e., the purchase order taken the second week of March would be for delivery the second week of May.

Large quantities of product are involved in pre-selling in that BeerMart pre-sells about 80,000 cases of beer per month. Thus, with the two month lead time, BeerMart usually has orders for approximately 160,000 cases of beer for delivery in the future. The prices for the product sold by BeerMart are directly related to the quantity of product purchased, i.e., the higher the volume of product ordered the lower the price. The largest discount given by BeerMart is for 3,500 cases of beer which is two semi-truck loads. BeerMart's competitors, Brumm and Lafayette Beverage as well as other Stroh wholesalers have complained to Stroh District Managers about BeerMart's transshipping and low prices. Stroh requires that records and reports on transshipping be made by its wholesalers.

In 1985, BeerMart sold 282,229 cases and 3,081 half barrels of Stroh products which accounted for 20.6 percent of BeerMart's total sales. In 1981, Stroh products accounted for 41.81 percent of BeerMart's total sales. This decrease is due, at least in part, to changes in the beer market. Stroh's percentage of the beer market in Indiana in 1985 was 17.4 percent so BeerMart's sales of Stroh products in relation to other products is very close to the market percentage Stroh maintains in Indiana.

BeerMart has a longstanding policy against the sale of overage beer. It provides a strong training program for its employees on the overage policy and constantly reminds them of the importance of

not selling overage product. There are notices posted in the warehouse with respect to the overage policy guidelines of the various breweries and BeerMart has meetings with its employees to emphasize the importance of adhering to the overage policy. BeerMart has a computer system that monitors the beer inventory. Upon receipt of product from the brewery, the beer is itemized, code dates are noted and the information is entered into the computer. BeerMart maintains a policy of first in-first out so that the oldest beer is used first to fill orders.

On October 29, 1985, John Smith, the individual in charge of the warehouse, second in command for BeerMart, and the individual ultimately responsible for checking code dates, repackaged outdated Schlitz 12 packs into 51 Schlitz 24/12 loose packs in order to fill an order BeerMart had received from one of its customers, Nick's Liquor Mart. Schlitz beer is a Stroh product and a loose pack is a container of beer which contains 24 single 12 oz. cans of beer. Most of the cans of Schlitz beer that were repackaged contained the code date 5150. Stroh cans are dated by Julian date, that is, the first number is the last digit of the year and the last three numbers are the day of that year from 1 through 365 that the beer was brewed. The Julian date on October 29, 1985 was 5302 so when the beer was repackaged, most of it was 152 days old or 47 days beyond the last permissible date of sale.

The original cartons from which the overage beer was taken had the code date for the beer printed on them. However, the loose pack cartons into which BeerMart repackaged the beer did not have a code date printed on them and therefore one could not tell simply by looking at the package that the beer was overage. One could observe the code date on the cans by opening the flaps on the carton. The beer was repackaged into unmarked cartons in order to conceal the fact that the beer was overage according to Stroh standards. It is not illegal or fraudulent to repackage beer and in fact it is done by wholesalers when the original carton in which the beer

has been packaged is damaged in shipment. A wholesaler can obtain cartons for repacking from the brewer for that purpose.

At the time that John Smith repackaged the beer, with the assistance of another BeerMart employee, David Shearer, John Smith knew that the beer was overage, i.e., not eligible for sale pursuant to then existing Stroh policies relating to overage product. John Smith knew his actions in repackaging the overage beer for sale was wrong, contrary to Stroh policy, contrary to and violative of established BeerMart policy and practice and was grounds for termination of the Agreement between Stroh's and BeerMart. The 51 cases of overage beer were sold by BeerMart to Nick's Liquor Mart (Nick's) in Hammond, Indiana on October 30, 1985. The invoice for Nick's indicated falsely that the repackaged beer was code dated 5273, which would have been fresh beer. Ralph Smith was in California at the time the overage beer was repackaged and sold, having left on October 25th and not returning until November 1st.

Lyle Webb, an employee of BeerMart who did not have a good relationship with Ralph Smith, observed John Smith and David Shearer repackaging the overage Schlitz beer cans into the loose packs on October 29, 1985. He noted that the beer being repackaged was code dated 5150 and that there were 51 cases repacked. Lyle Webb observed the order sheets in the BeerMart office and determined that the overage beer was being sent up north where Schlitz moved well in the market and would be sold to Nick's 1, Nick's 3, Indiana Last Liquors or possibly King Richard's Liquors. That same night or the next day, Lyle Webb reported what he had observed to one of his friends, Winn Wright, a former employee of BeerMart who was presently employed by Brumm. Brumm is a beer wholesaler and a competitor of BeerMart. At the time Lyle Webb told Winn Wright about what he observed, Lyle Webb anticipated that Winn Wright would tell Stroh's.

On October 31, 1985, Mr. Winn Wright told John Foschaar, the beer sales manager for Brumm, what Lyle Webb had told him about the repackaging activities of Beer-Mart and the shipment of overage beer to Lake County, Indiana. Mr. Foschaar conveyed this information to Mr. Dale Brumm, part owner of Brumm, who reported this information to Gerald Bahr, State Sales Manager for Stroh in Indiana. Mr. Foschaar also passed the information on to George Kiernan, President of Calumet Breweries of Hammond, Indiana. Sales persons for Brumm and Calumet Brewers were instructed to be on the lookout for the overage Schlitz beer at the four retail stores in question. Both Brumm and Calumet Breweries of Hammond, Indiana were competitors of BeerMart and had previously had the Nick's account.

On November 5, 1985, one of Brumm's employees, Sandy Farrell, purchased a case of Schlitz loose packs at Nick's on Calumet Avenue. This case of beer did not have date code numbers on the outside of the carton. Mrs. Farrell returned to the Brumm office where she and Mr. Foschaar opened the case and found that 11 cans were code dated 5150, six cans were code dated 5155, six cans were code dated 5198 and one can had no code date. Mr. Foschaar then telephoned Mr. Kiernan and told him about the overage Schlitz at Nick's on Calumet Avenue. Mr. Kiernan also sent someone to the store who purchased one of the case of the overage beer. All of the beer in that carton was code dated 5150.

At about 1:45 P.M. on November 5, 1985, Mr. Bahr and Mr. George Sherrell, the District Manager for the Northern Indiana District for Stroh, met with officers of Brumm at the Brumm warehouse and were notified that overage beer had been found at Nick's on Calumet Avenue. Upon receiving this information, Dale Brumm, Bill Brumm and John Foschaar took Mr. Bahr and Mr. Sherrell to the Nick's store in question. Mr. Bahr and Mr. Sherrell entered the store and each purchased one case of the overage Schlitz beer. Neither case had any code date of the outside of the carton. There were 43 cases of Schlitz beer which did not have any code date on the outside of the carton after Mr. Bahr and Mr. Sherrell purchased their two cases. Neither Mr. Bahr nor Mr. Sherrell made any arrangements to segregate the remaining cases of beer but left them to be sold by the retailer. Mr. Bahr and Mr. Sherrell then returned with Mr. Bill Brumm, Dale Brumm, and John Foschaar to the Brumm warehouse where they opened the two cases of Schlitz beer and found that all of the cans were code dated 5150. Mr. Bahr also inspected the cans which had been purchased by Brumm and verified the dates on those cans as well. Mr. Bahr was also told by Dale Brumm that George Kiernan had also purchased a case of this overage product. After viewing the three unmarked cases of Schlitz beer containing the overage product, Mr. Bahr telephoned William Beyer, House Counsel for Stroh in Detroit, and explained the situation to him. Mr. Beyer advised Mr. Bahr that he should confront Ralph Smith in person with the information he had. Mr. Sherrell also telephoned the Stroh office in Memphis and was advised that BeerMart had purchased 200 Schlitz repack cartons which did not have any code dates imprinted on them on September 30, 1985.

On the morning of November 6, Mr. Bahr and Mr. Sherrell went to the BeerMart offices in Rensselaer where they met with Ralph Smith. Mr. Bahr advised Ralph Smith that he had been to Nick's on Calumet Avenue the day before and had purchased two cases of unmarked Schlitz 24/12 cans dated 5151 and that he knew that they had been delivered by BeerMart. Mr. Bahr told Mr. Smith that BeerMart had sold 51 cases of unmarked cartons of overage product on October 30, 1985. Mr. Bahr then asked Mr. Smith for the invoice for Nick's No. 1 for the delivery date of October 30 which Mr. Smith produced. The invoice stated that BeerMart had sold 81 cases of the 24/12 loose packs. Mr. Bahr also asked to see the shipping log which Mr. Smith produced. The shipping log stated that the beer delivered was all code dated 5273. Mr. Bahr and Mr. Sherrell

then asked to see the warehouse where they were introduced to John Smith. John Smith did not make any statement about having repackaged the overage products. They did not find out-of-date beer on their inspection. Mr. Bahr advised Ralph Smith that knowingly selling Stroh product that was out-of-date was a serious matter. Mr. Bahr informed Mr. Smith that BeerMart was obligated to pick up all of the remaining overage product from Nick's. Prior to departing, Mr. Bahr advised Ralph Smith that BeerMart would be hearing from Detroit in writing on the matter. At this meeting, the only one Mr. Bahr or anyone from Stroh's had with BeerMart with respect to this incident, Ralph Smith seemed confused and agreed this was a serious matter.

After meeting with Ralph Smith, Mr. Sherrell and Mr. Bahr went to Mr. Sherrell's house to check BeerMart's past months' transshipping records. These records showed that BeerMart's first 1985 sales of the beer package in question had been in June 1985 and that all of those packages contained beer code dated 5150. They also checked the October transshipping report from BeerMart to see if any other Schlitz loose packs had been delivered in the Gary/Highland/Hammond market. There were several stores that had purchased loose packs code dated 5273. Mr. Bahr and Mr. Sherrell investigated these stores but found no unmarked cases. They later checked BeerMart's purchases and sales of Schlitz 12 packs and determined that BeerMart's first 1985 sales of Schlitz 12 packs were in June 1985, and that a substantial number of 12 packs had become out-of-date before BeerMart had sold them. It appeared to Mr. Sherrell and Mr. Bahr that BeerMart had repacked these outdated 12 packs, all of which were date coded 5150, into unmarked 24/12 loose packs and then sold those loose packs to Nick's.

Mr. Sherrell and Mr. Bahr returned to the Brumm offices on the afternoon of November 6, where they requested that Mr. Foschaar arrange a meeting with Mr. Webb and Mr. Wright after they got off work and Mr. Foschaar did so. On the evening of November 6, 1985, Mr. Bahr, Mr. Sherrell, Mr. Foschaar, Mr. Wright and Mr. Webb met at the Orange Bowl Restaurant in Valparaiso. After talking with Mr. Webb and Mr. Wright, Mr. Bahr and Mr. Sherrell took Mr. Webb to a nearby hotel where Mr. Webb gave them a written statement concerning his knowledge of this incident in which he stated that he had observed Mr. John Smith and David Shearer repackaging the overage product for sale to one of BeerMart's customers. On November 7, 1985, Mr. Sherrell called BeerMart to find out if they had picked up the overage Schlitz beer from Nick's Liquors. Ralph Smith told Mr. Sherrell that the beer had been picked up and that it was all code dated 5273.

After Mr. Bahr and Mr. Sherrell visited BeerMart on November 6, Ralph Smith instructed Kenneth Buchanan, a salesman for BeerMart to go get all of the Schlitz beer in unmarked loose packs that had been repackaged. Mr. Buchanan went to Nick's No. 1 on Calumet Avenue on the evening of November 6 where he picked up 33 or 34 cases of Schlitz loose packs which were in cartons unmarked with code dates. Mr. Buchanan exchanged these unmarked cartons of Schlitz cases for about 60 or 70 six packs which had fresh beer. Mr. Buchanan also went to the other two Nick's Liquor Stores, but did not find any additional unmarked cartons of Schlitz. After checking the other Nick's stores for overage beer, Mr. Buchanan then went to State Line Sales where he picked up 40 cases of Schlitz 24/12 loose packs having a code date of 5273, the false code date used on the BeerMart shipping log for the sale of the overage beer. Mr. Buchanan then returned to Ralph Smith's home and told him that he had picked up the unmarked cartons and that they were in the van.

Mr. Buchanan then went to the BeerMart warehouse where he switched the beer having the code date of 5273 for the overage beer having a code date of 5150. In making the switch, Mr. Buchanan took the fresh cans out of the containers which had

a code date of 5273 on them and repackaged them in unmarked containers. He left these unmarked cartons containing the cans code dated 5273 in the back room of the warehouse. Mr. Buchanan also inspected the cans which he had picked up at Nick's. His inspection of these cans showed that they were outdated. Mr. Buchanan then loaded the outdated product back on the van and took the van back to Ralph Smith's house. On the morning of November 7, John Smith picked up the van with the overage beer in it and took the overage beer cans to the old BeerMart warehouse and then to his farm where he put the old beer in barrels and burned the containers. He then snuck the old beer back in the BeerMart warehouse.

The actions by John Smith and Kenneth Buchanan with respect to the switching of the beer were part of a scheme devised by John Smith to cover-up the sale of the overage beer to Nick's. John Smith had talked to Kenneth Buchanan on November 6 about the attempt to cover-up the sale and the two of them carried it out. Ralph Smith did not know that John Smith had intentionally repackaged and sold the overage beer nor did he know about the cover-up until November 18th when John Smith told him the whole story.

On November 11, 1985, Mr. Bahr met with Mr. Beyer, Stroh's in-house counsel, and Mr. Jim McCowan, Director of Sales Administration for Stroh. Mr. Beyer discussed with Mr. McCowan and Mr. Bahr the facts concerning the investigation of the sale of the overage product by Beer-Mart to Nick's. After this discussion, a telephone call was made to Mr. Kenneth Tippery, Group Vice President of Sales for Stroh. Mr. Tippery's duties and responsibilities as Group Vice President involve two main areas: international sales and wholesaler network development. His responsibilities with respect to wholesaler network development include wholesaler appointments, assignments, deficiencies, programs aimed at strengthening the wholesaler network operationally and strategically and wholesaler terminations. Mr. Tippery does not have any written guidelines to govern the decisionmaking process for the termination of a wholesaler. The decision to terminate is left to the sole and exclusive discretion of Mr. Tippery.

Mr. Tippery was informed of the facts concerning Mr. Bahr's investigation of the sale of overage Schlitz beer. The basic information discused was contained in a report memorandum prepared by Mr. Bahr regarding the incident. Mr. Tippery received a copy of that report after the phone conversation at the time he received the draft of the termination letter from Mr. Beyer. This phone call lasted about 45 minutes and was the first time Mr. Tippery became aware of the BeerMart incident. Prior to this incident, Mr. Tippery had no information that BeerMart had breached the Agreement nor that Stroh had any complaints with BeerMart. During the phone call, Mr. Tippery tried to verify the proof that Stroh's had that BeerMart had intentionally repackaged and sold out-of-date beer. After discussing the incident in detail, Mr. Tippery decided to terminate Beer-Mart as a Stroh wholesaler principally based on BeerMart's actions with respect to the incident in question, i.e. the repackaging and cover-up activities. In a letter dated November 11, 1985, which was drafted by William Beyer and signed by Kenneth Tippery, Stroh gave notice of the immediate termination of the wholesaler Agreement with BeerMart pursuant to Section 11 of the wholesaler Agreement. The letter of termination recites the following factual basis:

> It has come to our attention that your company has recently repackaged 12/12 oz. Schlitz cans which were clearly overaged pursuant to Stroh's existing Beer Age and Storage Policy and resold these 12/12 oz. packages as 24/12 loose can packages. More specifically, it is understanding that these 12/12 oz. Schlitz can packages were repacked into at least 51 24/12 oz. packages and sold to Nick's Liquor Mart No. 1 located at 4702 Calumet Avenue, Hammond, Indiana, on or about October 30, 1985.

It is further our understanding that the sale of the repacked, overaged Schlitz cans to this retail account was not an isolated incident, but rather, that it is common practice for your company to repackage overaged malt beverage products and then to resell them.

Said letter was sent "Airborne" to Beer-Mart on November 11 and received by BeerMart on November 12.

In the phone conversation in which the termination of BeerMart was discussed, there was no concern raised that the termination be done fairly and with due regard for the equities of BeerMart and fairness and equitability were not the principal basis for the decision to terminate. Rather, Mr. Tippery was only concerned with Beer-Mart's actions surrounding the sale of overage beer. In reaching the decision to terminate, Mr. Tippery did not consider what adverse impact there might be on BeerMart if terminated nor did he consider BeerMart's past practices or past sales of Stroh's products. In fact, Mr. Bahr, the individual who supplied the majority of the information to Mr. Tippery that formed the basis of the decision to terminate, had not even checked BeerMart's records prior to the meeting and phone call to determine if there had been any past problems with BeerMart. Further, none of the individuals from Stroh's involved in any way with the BeerMart incident had any knowledge of any past problems with BeerMart selling overage product.

The November 11 letter also stated as a factual basis for termination that the sale in question was not an isolated incident but that it was a common practice of BeerMart to engage in such conduct. Mr. Tippery stated that this allegation was based on an expressed opinion of Mr. Bahr in the phone conversation. Mr. Bahr testified that this information was based on a statement by Lyle Webb. No one at Stroh's verified this information even though it was contrary to the knowledge Stroh employees had of BeerMart's operations prior to the incident in question. Mr. Tippery testified that he had no evidence to support the "common practice" allegation but that it was not a major factor in the decision to terminate and only slightly influenced the decision. In explaining the significance of the "common practice" allegation in his decision, Mr. Tippery stated that on a scale of 1 to 10, he considered BeerMart's actions a 9.7 without the common practice added and that he would have signed the termination letter anyway because of the flagrancy of Beer-Mart's actions in connection with the October 1985 incident. Further, Mr. Tippery did not believe that the number of cases involved, i.e., 51 cases, was an important factor. He did state however, that if only four cases were involved, he probably would not have found out about it.

At the time he made the decision to terminate, Mr. Tippery did not know that Ralph Smith was in California at the time the overage beer was repackaged and sold. Mr. Tippery was not familiar with Beer-Mart's training policies with respect to the sale of overage beer nor with BeerMart's marketing efforts of pre-selling beer. Mr. Tippery was not aware that Mr. Sherrell, the District Manager for Stroh covering BeerMart, had prepared a special report in April 1985 that stated that BeerMart had the advantage of having all the major brands, a sound financial backing and an efficient organization. Mr. Tippery did not believe that this information was important however since he was principally and primarily concerned with BeerMart's activities in repackaging and selling the overage beer to Nick's. Further, at the time of decision making Mr. Tippery was not familiar with BeerMart's computerization or inventory control methods.

In making the decision to terminate, Mr. Tippery did not consider BeerMart's business reputation in the industry and community, what assets BeerMart had acquired to distribute beer nor the fact that the termination might require BeerMart to lay off some employees. To Mr. Tippery, two factors were important: (1) the repackaging of the overage beer; and (2) the sale of the overage beer. Accordingly, it was irrelevant what Stroh brands BeerMart car-

ried and the fact that BeerMart was a transshipper had no significance in the decision to terminate.

In the phone conversation, Mr. Tippery inquired how many cases Stroh products BeerMart sold and whether there were any mitigating circumstances. Mr. McCowan replied that BeerMart sold about 100,000 cases and Mr. Bahr could offer no mitigating circumstances and recommended that BeerMart be terminated as a wholesaler. In Mr. Tippery's opinion, mitigating circumstances would include the inability to cover the market without the particular wholesaler or extraordinary personal circumstances, such as poor health or death. A proposal with respect to assigning BeerMart's primary territory was submitted to Mr. Tippery by Mr. Bahr on November 11, 1985.

BeerMart's actions with respect to the repackaging and sale of the overage Schlitz beer caused Stroh to lose trust and confidence in BeerMart and Mr. Bahr testified that he was afraid BeerMart might engage in the same actions again. Indiana law requires a wholesaler to specifically invoice all items delivered to a retailer and the brewery maintains records on all beer delivered to its wholesalers thereby making it possible to check whether a wholesaler is selling overage beer. Mr. Bahr believes, however, that this paper trail can be falsified.

After receiving the notice of termination by Stroh, Ralph Smith initiated this action in Jasper Superior Court by filing its first complaint together with a Motion for a Temporary Restraining Order supported by affidavits. One of those supporting affidavits was that of Kenneth Buchanan who was then a BeerMart employee who has since been fired. Mr. Buchanan's affidavit states that on or about November 6, 1985 he returned to BeerMart's warehouse after picking up 33 loose-pack cases without code dates from Nick's Liquor Mart, and that:

> At the warehouse, I inspected each can of beer in each case which did not contain a code date; said cases totaled approximately 33 in number.... As a result of said inspection, I did not find any can of beer that contained a code date which indicated that it was overage.

These statements of Mr. Buchanan were false and he knew they were false when he signed the affidavit.

At the time that Mr. Buchanan executed the affidavit, Ralph Smith did not know that the facts contained therein were false nor did he know they were false when he filed it in support of the motion for a temporary restraining order. When Ralph Smith found out that the facts in Mr. Buchanan's affidavit were false, the affidavit was changed. BeerMart was successful in obtaining a temporary restraining order in Jasper Superior Court and has continued to receive Stroh products under that restraining order to the present time.

Ralph Smith has implemented some changes at BeerMart since he has found out the true facts surrounding the October 1985 incident. BeerMart (1) has started dating all repackaged beer on the outside of the carton, (2) now puts all out-of-date inventory in a locked cage, (3) fired Kenneth Buchanan, (4) relieved John Smith of all administrative duties, (5) and has hired someone to check code dates at the retailer level, thereby essentially separating sales from quality control. Ralph Smith informed Stroh of the changes being made by letter dated November 26, 1985 to Mr. Tippery. Stroh did not respond to Ralph Smith's letter since BeerMart had already been terminated. Other changes are being made to insure that the incident is not repeated.

Ralph Smith testified that if BeerMart was unable to distribute Stroh products, many BeerMart customers would be unable to reach the quantity levels necessary to obtain the best discount and that BeerMart would lose all but two of its major accounts for purposes of selling by the semi-truck load. Further, Ralph Smith testified that BeerMart would lose more than just the percentage of its sale attributable to Stroh products. BeerMart would no longer be a full service house and would not be able to make up to loss by the sale of products from other breweries because it would

cause too much beer of a particular kind to be on the market and would therefore go past code date before it could be sold.

BeerMart's marketing strategy of pre-selling would also be affected since Beer-Mart could not furnish the product already ordered by many of its customers and its good will would therefore be damaged. Many of BeerMart's costs of operation are fixed and those fixed costs could not be reduced proportionately if BeerMart lost the right to distribute Stroh products. BeerMart would also incur additional expenses if it lost the right to distribute Stroh products because BeerMart delivery trucks would not be filled. Ralph Smith testified that damages would be difficult to calculate in the case and that a damage award could not bring back the business that BeerMart had built up for thirty years anyway. Finally, Ralph Smith testified that it was quite likely that BeerMart would go out of business if it lost the right to distribute Stroh products. In contrast, Mr. Bahr testified that he did not know of any way that Stroh is being damaged by BeerMart continuing to sell and deliver Stroh products under the temporary restraining order.

## II.

BeerMart's original complaint for Injunction filed November 13, 1985 in the Jasper Superior Court alleged that Stroh breached the Agreement between the parties and violated I.C. § 7.1–5–5–9 when it terminated BeerMart as a Stroh wholesaler and sought an injunction against Stroh pursuant to I.C. § 7.1–3–3–17. That case was removed to this court after a temporary restraining order was issued in the state court case. Plaintiff filed an Amended Complaint in this court on December 4, 1985 adding Brumm Distributing Company, Inc. as an additional defendant and for its "second cause of action" alleged that Stroh and Brumm conspired against BeerMart causing injury and damage to BeerMart in the following manner:

(A) Contrary to Indiana Law and specifically Indiana Code I.C. 7.1–5–9–2, and 7.1–3–3–18, Strohs and Brumms have conspired to control the business of Beer-Mart by using illegal means of restricting supply and brands of beer to Beer-Mart and by unlawfully terminating its wholesale agreement with Strohs to coerce or cause BeerMart not to sell outside its area of primary responsibility as defined by Strohs Wholesale Agreement and especially to refrain from selling within the primary market of responsibility of Brumms lessening competition and increasing prices of beer.

(B) Strohs and Brumms have conspired to prevent and restrict BeerMart from selling beer sold by Strohs to Indiana wholesalers, by restricting supply and brands of beer to BeerMart in violation of Alcoholic Beverage Regulation 905 IAC 1–28–1, sub-paragraph (3) which reads in relevant parts as follows:

> Sec. 1. It shall be unlawful for any person engaged in business as a distiller, brewer, rectifier, vintner, or other producer, importer, or as a wholesaler of liquor, wine, beer or malt beverage, directly or indirectly, or through an affiliate to:
>
> Product Distribution-Restrict by agreement or otherwise, the sale ... of ... beer or malt beverages ... to permittees, who are otherwise entitled to buy, within a given geographical area....

and of Indiana Statute I.C. 24–1–1–1 and I.C. 24–1–2–1 prohibiting any agreement in constraint of trade or lessening full and free competition, and § 1, § 2 and § 3 of the Anti-Trust Act, 15 USC § 1, § 2 and § 3.

On January 29, 1986, BeerMart filed another Amended Complaint which contained six counts. Count I is apparently based on its breach of contract claim as contained in its original complaint and Count II is apparently based on the "second cause of action" as set forth in the Amended Complaint filed December 4, 1985. Count III alleges a violation of 15 U.S.C. § 1 and Count IV is based on essentially the same facts as Count III and alleges a violation of the

Indiana Monopoly Act, I.C. § 24–1–2–1. Count V alleged a violation of I.C. § 7.1–5–5–9 and Count VI alleged tortious interference with contractual relations on the part of Brumm.

At the hearing on the preliminary injunction held on March 6, 1986, BeerMart dismissed Brumm as a defendant in this case. Accordingly, the only remaining defendant is Stroh. Further, BeerMart stated that its request for a preliminary injunction in this case is based solely on its state law claims and not on its federal antitrust claims and suggested that it may not pursue said claims any further. In light of these developments, it is not clear that it would be appropriate to base a decision in this case on the exercise of federal question jurisdiction under 28 U.S.C. § 1331 or the provisions of 28 U.S.C. § 1337 relating to federal antitrust statutes. However, the amount in controversy in this case exceeds $10,000.00, exclusive of interest and costs and the parties are of diverse citizenship so this court can properly exercise jurisdiction under 28 U.S.C. § 1332. Further, BeerMart and Stroh are found and transact business in this district so this court has personal jurisdiction of the parties and venue is proper under 28 U.S.C. § 1391.

The issuance of a preliminary injunction is an extraordinary remedy and involves the exercise of a far-reaching power. *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1432 (7th Cir.1986) (Lawson). Further, since a preliminary injunction is equitable in nature, there is no "right" to obtain one, *Lawson* at 1434 and should only be granted in a case clearly warranting it. The decision to grant or deny a preliminary injunction is entrusted to the sound discretion of the district court although that discretion is not without bounds. The law sets forth certain traditional factors that must be considered in deciding whether or not to grant a preliminary injunction. Those factors include: (1) plaintiff's likelihood of prevailing on the merits; (2) whether plaintiff had an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened injury to the plaintiff if the injunction is not granted outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the injunction would harm the public interest. *See, e.g., Brunswick Corp. v. David D. Jones, Jr.,* 784 F.2d 271, 273 (7th Cir.1986); *Lawson,* at 1431–32; *Mantek Division of NCH Corp. v. Share Corp.,* 780 F.2d 702, 706 (7th Cir. Jan. 7, 1986); *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 382–88 (7th Cir.1984); *Lafayette Beverage Distributors v. Anheuser Busch, Inc.,* 545 F.Supp. 1137, 1146 (N.D.Ind.1982); *see also Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325, 1347 (7th Cir. 1986). The court must flexibly weigh and balance those factors in an attempt to achieve a result that is fair and just, that will maintain the status quo of the parties pending resolution of the case on the merits and that will avoid the error that is more economically costly in the particular circumstances of the case. *Lawson, supra* at 1434–36; *Ball Memorial Hospital, supra* at 1333; *see American Hospital Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589 (7th Cir.1986); *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984). Further, the courts have recognized an important inverse relationship between two of the factors, likelihood of success on the merits and balance of harm, that must be considered by the district court in its weighing and balancing process. Thus, the more heavily the balance of harm weighs in favor of the plaintiff, the degree with which the plaintiff must demonstrate likelihood of success on the merits decreases and vice versa. *Lawson, supra* at 1434; *Brunswick, supra* at 275; *Roland Machinery Co. v. Dresser Industries,* 749 F.2d at 387–88.

*1. Likelihood of Success on the Merits*

[4] In its Trial Brief as well as its Proposed Memorandum and Order submitted after the March 6, 1986 hearing, BeerMart only addressed its claims relative to the alleged breach of contract and violations of I.C. § 7.1–5–5–9 and its entitlement to an

injunction under I.C. § 7.1–3–3–17. It did not discuss the merits of its claims with respect to restraint of trade under Indiana law nor its claim of a violation of Indiana Alcoholic Beverage Regulation 905 IAC 1–28–1(3). BeerMart suggested in its Proposed Order that perhaps the evidence revealed that Stroh terminated BeerMart for a reason other than the sale of overage beer and pointed to evidence regarding complaints about BeerMart's low prices and transshipping, Stroh's attitude towards transshipping, Stroh's restriction of brands that a wholesaler may sell and Stroh's policy with respect to consolidation of its wholesalers. To the extent that this reference to "other reasons" is intended to support BeerMart's claims with respect to restraint of trade under Indiana law, this court finds these arguments unpersuasive.

Section 24–1–1–1 of the Indiana Code basically provides that contracts, agreements or combinations that lessen full and free competition or that tend to set prices are against public policy, unlawful and void. There is no evidence in this record of any such contract, agreement or combination that violates this provision. The only evidence of a contract in this case is the Wholesaler Agreement between Stroh and BeerMart and that contract cannot be characterized as being designed nor does it tend to lessen full and free competition or set prices. Stroh sells its products to all of its Indiana wholesalers at the same price and each of the wholesalers determines its own resale price to its customers. The evidence reveals that BeerMart gives some of its large quantity customers discounts that are not available to other customers that do not buy such large quantities. The determination of that pricing structure however is left totally to BeerMart. Further, although the Wholesaler Agreement designates BeerMart's area of primary responsibility, it does not restrict the area in which BeerMart may sell Stroh products. Accordingly, this court finds that BeerMart has failed to show any likelihood of success on the merits of its alleged violation of I.C. § 24–1–1–1.

Likewise, this court finds that BeerMart has not shown a likelihood of success on the merits of its claim under I.C. § 24–1–2–1. This provision prohibiting combinations in restraint of trade was substantially patterned after the federal Sherman Antitrust Act. *Orion's Belt, Inc. v. Kaysar-Roth Corp.*, 433 F.Supp. 301 (S.D. Ind.1977), and reference may be made to the decisional law under the Sherman Act in construing I.C. § 24–1–2–1. BeerMart's contention that Stroh's decision to terminate may have been related to complaints by other wholesalers regarding BeerMart's low prices and transshipping and thus constituting concerted action in violation of the prohibition against restraint of trade is not supported by the evidence in this case. The mere receipt of complaints from dealers or wholesalers combined with the manufacturer's termination of a wholesaler is not sufficient to establish concerted actions in violation of the antitrust laws. Rather, it must be proven that the termination was made in response to those complaints in order to establish liability. *See e.g., Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir.1982); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 743–44 (7th Cir.1982). The evidence in this case reveals that Stroh's decision to terminate BeerMart was not made in response to the complaints by Lafayette Beverage and Brumm. When Stroh received those complaints, it told those wholesalers that it could not do anything about BeerMart's transshipping activities since transshipping was legal in Indiana. Likewise Stroh's attitude toward transshipping, its restriction of brands and its policies regarding consolidation cannot form the basis of a claim for a violation of I.C. § 24–1–2–1. Although Stroh's attitudes and policies may have an effect on competition, there must be some combination or collusive action between two or more distinct entities before there can be a violation of the antitrust laws, unilateral action is not sufficient. A manufacturer is free to unilaterally decide with whom it will do business. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992

(1919); *A.C. Becken Co. v. Gemex Corp.*, 272 F.2d 1, 3 (7th Cir.1959), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 876 (1960). The record shows that Stroh's decision to terminate BeerMart was made solely by Stroh without consultation or collusion with any other person or entity. Accordingly, BeerMart has failed to show a likelihood of success on the merits in establishing that Stroh has violated I.C. § 24–1–2–1.

 Although BeerMart has failed to show a likelihood of success on the merits of its claims with respect to restraint of trade, the evidence reveals that BeerMart has met the threshold requirement of showing some probability of success on the merits of its claims for breach of contract and violation of I.C. § 7.1–5–5–9. Under Section 11 of the Agreement, Stroh can immediately terminate the Agreement for selling overage beer or for fraudulent conduct by a wholesaler in dealing with Stroh or Stroh products. In this case, BeerMart admitted it sold overage Stroh product and the actions by John Smith in repackaging and attempting to cover-up the sale can certainly be characterized as fraudulent conduct with respect to Stroh and Stroh products. BeerMart argues however that since Ralph Smith did not know about the sale or the cover-up scheme and the Agreement is a personal service contract, Stroh cannot terminate BeerMart based on the actions of one of its employees. The undisputed facts are, however, that John Smith was second in charge at BeerMart, was responsible for the day to day operations of the business and in charge of the warehouse. At the time of the incident, John Smith also owned one share of stock in BeerMart. Although it may be unfortunate for Ralph Smith and BeerMart, the actions of John Smith are attributable to BeerMart and BeerMart cannot use this as a basis for a claim in this case. According, under the plain language of Section 11 of the Agreement, Stroh could immediately terminate BeerMart as a wholesale distributor of Stroh products. However, the court must look to all the language contained in the Agreement in ruling on plain-

tiff's claim for breach of contract and not just one section.

 Section 23(B) of the Agreement specifically incorporates the law of Indiana in the Agreement and provides that the law so incorporated supersedes the provisions of the Agreement to the extent that there may be inconsistencies. Accordingly, I.C. § 7.1–5–5–9 is incorporated in the Agreement. That statute provides in pertinent part as follows:

> Sec. 9. Unequitable Termination of Contract Prohibited. It is unlawful for a beer wholesaler or a brewer in this state, or a brewer or other person located outside this state who sells beer to a permittee in this state for the purpose of importation and resale within this state to:
>
> (2) Cancel or terminate an agreement or contract between a beer wholesaler and a brewer for the sale of beer, unfairly and without due regard for the equities of the other party.

The incorporation of this statute in the Agreement requires that in addition to determining that grounds for termination existed, Stroh must also have considered fairness and the equities of BeerMart in reaching its decision to terminate. The evidence submitted in this case reveals that Stroh's decision was not made with these considerations in mind.

Mr. Tippery, the individual at Stroh that made the decision to terminate BeerMart had not heard about the incident in question until he received a phone call on November 11, 1985. During that 45 minute phone call, Mr. Tippery was informed of the facts surrounding the incident, which was the only information he believed was relevant to his decision to terminate. He did not consider what impact a decision to terminate would have on BeerMart. Further, Mr. Tippery's testimony reveals that no consideration was given to whether a termination of BeerMart would be fair. He did not know BeerMart's past practices or past sales of Stroh products, he did not know that Ralph Smith was in California when the incident occurred, nor was he

aware of BeerMart's marketing scheme with respect to pre-selling and did not believe that information was relevant or important to his decision.

This court finds that BeerMart has a reasonable likelihood of succeeding on the merits of its claim that the decision to terminate was not fair nor made with due regard for the equities of BeerMart in violation of I.C. § 7.1–5–5–9 and in breach of the Agreement. The decision to terminate was made by an individual based on a 45 minute phone call, within 12 days of Stroh learning of the incident. Mr. Bahr represented to Mr. Tippery that the sale of overage beer was a common practice of Beer-Mart based on the statement of a disgruntled BeerMart employee. No attempt was made to verify the statements of Lyle Webb even though the statement was contrary to the knowledge of Stroh employees. The past record of BeerMart was not checked before Mr. Bahr called Mr. Tippery to discuss the termination of BeerMart. Mr. Bahr and Mr. Sherrell had one meeting with Ralph Smith with regard to the incident in question and no further attempt was made by Stroh to ascertain any more information from BeerMart or to discuss the possibility of a termination or what BeerMart could do to avoid being terminated as a Stroh wholesaler. No regard was given to the fact that BeerMart had been a successful Stroh distributor for 33 years, the fact that Ralph Smith was in California at the time of the incident nor the fact that this was the first time that BeerMart had sold overage beer. Further, the termination of BeerMart was immediate, giving BeerMart no opportunity to wind up its business with respect to Stroh products. This was especially critical because of BeerMart's practice of pre-selling beer.

According, the court finds that BeerMart has sustained its burden with respect to the first factor that must be considered by this court in ruling on a motion for a preliminary injunction. This court further notes that the finding in this case with respect to fairness and due regard for the equities is based on facts not present in the *Lafayette Beverage Distributors v. Anheuser-Busch,* *Inc.,* 545 F.Supp. 1137 (N.D.Ind.1982) case decided by this court in 1982. In *Lafayette Beverage,* Mr. James Lamb, the President and General Manager of Lafayette Beverage, knew of and participated in the activities that formed the basis of Anheuser-Busch's decision to terminate and Lafayette Beverage had sold overage products of Anheuser-Busch and other brewers before the incident in question. Anheuser-Busch spent approximately four months investigating the situation and deliberating about what to do, which process included talking to Lafayette Beverage officials about a way to restructure Lafayette Beverage's wholesaler operation so that James Lamb would no longer be involved in the distribution of Anheuser-Busch products. Finally, Lafayette Beverage had no long term commitments to supply its customers with Anheuser-Busch or any other products. The facts in the case presently before the court are substantially different as outlined above.

2. *Irreparable Injury and Inadequate Remedy at Law*

The evidence in this case reveals that BeerMart would suffer irreparable harm if an injunction is not issued. Beer-Mart has built its business over 30 years as being a full service house in that it can provide its customers with a product mix of various brands from all the major breweries. Because of this ability, it can sell in larger quantities and give its customers larger discounts. If BeerMart was not able to supply its customers with Stroh products, it would no longer be a full service house and could not provide its customers with the quantity discounts. Further, BeerMart could not replace the Stroh products with other brands because that would cause too much of a given product to be on the market that would result in the beer becoming overage before the retailer could sell it to the consumer. Ralph Smith testified that BeerMart would lose more than just the percentage of sales represented by Stroh products and that BeerMart would likely go out of business if it lost Strohs. In addition, BeerMart's marketing

strategy of "pre-selling" a large percentage of its total sales would be seriously affected. BeerMart has outstanding orders for all of the products it distributes for delivery 60 days in the future. Without an injunction, BeerMart will not be able to fill those purchase orders and will sustain damage to its good will.

By definition, an injury is not irreparable if there exists an adequate legal remedy for such injury, *American Hospital Ass'n v. Harris,* 625 F.2d 1328, 1331 (7th Cir.1980); *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 527 (3d Cir.1976), and damages are the legal remedy generally considered. However, to be an adequate legal remedy, damages must be readily calculable and collectible. *Roland Machinery Co. v. Dresser Industries,* 749 F.2d at 386; *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189 (4th Cir.1977). In this case, calculating damages would be difficult, if not impossible. BeerMart's lost profits on selling Stroh products would afford a plausible basis for calculating some of BeerMart's damages from a wrongful termination but not all of the damages. Further, even if damages could be calculated, a damage award would likely come too late to save BeerMart's business that it has built for over thirty years.

Finally, an Indiana statute specifically provides for injunctive relief for violations of I.C. § 7.1-5-5-9 and states that an action may be brought by a brewer or a wholesaler who is or might be adversely affected by a cancellation or termination of a wholesaler agreement. Thus, this statute recognized that an important consideration in the preliminary injunction context is maintaining the status quo of the parties pending resolution of the case on the merits. In light of the above discussion, the court finds that BeerMart has shown the requisite irreparable harm and lack of adequate legal remedy at law if an injunction is not issued in this case.

### 3. *Public Interest*

The issuance of a preliminary injunction in this case would not harm the public interest. Although the public is deceived when a person sells an inferior product as a superior product and such deception should be guarded against, the facts indicate that the sale of overage beer by BeerMart was an isolated incident and that BeerMart has taken steps to insure that it does not happen again. Further, the public is interested in seeing that the law is complied with and that Indiana businesses are dealt with fairly by national corporations.

### 4. *Balance of Harm*

The facts reveal that the balance of harm tips in favor of BeerMart in this case. Stroh has not been harmed by continuing to supply product to BeerMart under the temporary restraining order and would not be harmed in continuing to supply BeerMart pending the resolution of this case on the merits. The record reveals that 51 cases of overage beer was repackaged and sold by BeerMart and that 37 or 38 of those cases were recovered from Nick's before they were sold to the consuming public. Any harm caused by the sale of the other 14 or 15 cases of overage has already been suffered by Stroh. Further, Ralph Smith has instituted changes at BeerMart to insure that such an incident does not occur again so there would be little or no harm to Stroh if a preliminary injunction were issued in this case.

On the other hand, the harm to BeerMart if the injunction is not issued is substantial. BeerMart has built its business over the past 30 years on being a full service house in that it can supply its customers with products from all the major breweries. If it lost the right to distribute Stroh products, it would no longer be a full service house and Ralph Smith testified that he believed that BeerMart would lose more than just the percentage of its sales attributable to Stroh products. Further, BeerMart has a marketing program whereby it pre-sells a large percentage of its total sales and has orders for products, including

Stroh products, approximately 60 days in advance of delivery. If BeerMart were unable to obtain the Stroh products, it would not be able to fill those orders from its customers and would suffer injury to its good will. Many of BeerMart's costs of operation are fixed and would not be reduced proportionately if it no longer handled Stroh products. Accordingly, the balance of harm in this case weighs decidedly in favor of BeerMart.

### III.

Based on the foregoing findings of fact and conclusions of law, the court finds that BeerMart has carried its burden of persuasion with respect to the four factors that must be considered by the court in ruling on a request for a preliminary injunction and is entitled to the relief requested. Further, the court finds that Stroh's argument based on the equitable doctrine of "unclean hands," see, *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Mantek Division of NCH Corp. v. Share Corp.*, 780 F.2d at 707 (7th Cir.1986), does not prohibit the issuance of preliminary injunction in this case.

Accordingly, the court hereby GRANTS BeerMart's motion for a preliminary injunction and hereby enters a preliminary injunction enjoining and restraining The Stroh Brewery Company, its agents, servants, employees and attorneys and all persons in active concert and participation with it, from terminating its contract with BeerMart; from refusing to provide plaintiff with its products pursuant to said Agreement, from supplying plaintiff's customers with its products by means of another source, and from soliciting, contracting and communicating with plaintiff's customers for the purpose of disrupting plaintiff's existing business relationship until the trial on the merits of plaintiff's complaint or until further order of this court; PROVIDED THAT BeerMart first post a cash security bond in the total sum of Fifty Thousand Dollars ($50,000.00), or in the alternative, post a bond in the sum of Fifty Thousand Dollars ($50,000.00) secured by a Surety Company approved by the United States Department of Treasury as listed in the Federal Register. SO ORDERED.